Wanda S. VAN HOOVE, Plaintiff,

v.

MID–AMERICA BUILDING
MAINTENANCE, INC.;
et al., Defendants.

Civ. A. No. 90–1068–FGT.

United States District Court,
D. Kansas.

Dec. 15, 1993.

Alan L. Rupe, Rupe & Girard Law Offices, P.A., Wichita, KS, for plaintiff Wanda S. Van Hoove.

William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, KS, for defendant Mid-America Bldg. Maintenance, Inc.

## OPINION AND ORDER

THEIS, District Judge.

The plaintiff, Wanda Van Hoove, brought this action for alleged violations of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") amendments, 29 U.S.C. §§ 1161 et seq., to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.[1] Specifically, plaintiff alleges that defendant Mid–America Building Maintenance, Inc., ("Mid–America") failed to comply with the notice requirements of 29 U.S.C. § 1166. Plaintiff seeks to recover damages, prejudgment interest, attorney's fees, and a $100 per day penalty under ERISA's civil enforcement provision, 29 U.S.C. § 1132. The matter was tried to the court the week of September 27, 1993. The court heard the testimony of a number of witnesses and had the opportunity to evaluate their demeanor and credibility. The parties have filed their proposed findings of fact and conclusions of law. After considering the evidence presented and the arguments of the parties, the court now issues the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Defendant Mid–America Building Maintenance, Inc., ("Mid–America") is a Kansas corporation that contracts to perform janitorial services for various businesses. Mid–America has, and has had at all times relevant to this action, its main office in Wichita, Kansas, and branch offices in surrounding towns.

2. Gary Ackerman is a forty-nine percent shareholder in Mid–America. He is the company's vice president in charge of day-to-day operations, as well as the corporate secretary-treasurer. (Testimony of Gary Ackerman).

3. Abel Perez is Mid–America's personnel director. He has held that position full time since October 27, 1987. Perez testified that his responsibilities include administering employee programs, including health insurance. Perez handled payroll deductions, answered employee questions, enrolled employees in the health insurance plan, and provided COBRA notifications to employees. (Testimony of Abel Perez).

---

**1.** Plaintiff settled similar claims against Lincoln National Life Insurance Company and Corroon and Black Benefits, Inc.

4. Perez testified that he received information regarding health insurance from Lisa Bacon, an employee of Corroon and Black, and from Ed Wilson, an insurance consultant with whom Mid–America contracted on an hourly basis. Perez estimated that he spoke to Bacon three or four times per month, when he had questions. Perez testified that he followed any advice or instructions Bacon gave him. Perez testified that his only training regarding COBRA came from Ed Wilson. Perez had no formal COBRA training. (Testimony of Abel Perez).

5. Allen J. Reed was a part time employee of Mid–America from April 27, 1987, to May 9, 1987, at which time Reed quit his job. Reed was rehired as a full time employee on or about August 22, 1987. He remained a full time employee of Mid–America until he again terminated his employment on or about April 11, 1988. Reed worked out of Mid–America's Winfield, Kansas, office. (Testimony of Allen Jay Reed; Defendant's Exhibit C).

6. Reed became eligible for benefits, including Mid–America's employee health insurance plan, on November 22, 1987, three months after he started full time employment with Mid–America. (Ex. 35).

7. At the time Reed became eligible for health insurance, Mid–America had a health insurance policy from Mutual Benefit Life. On January 1, 1988, the company dropped the Mutual Benefit Life policy in favor of a policy issued to the Trade Association Group Insurance Trust ("Trust"), of which Mid–America was a contributing member. The insurance was provided by Lincoln National Life Insurance Company ("Lincoln National"). (Plaintiff's Exhibits 8 & 9; Testimony of Abel Perez).

8. It is undisputed that Mid–America was the plan administrator under the Mutual Benefit Life policy. (Testimony of Abel Perez).

9. Lincoln National had executed an agreement with Corroon and Black Benefits, Inc., ("Corroon and Black") in which Corroon and Black agreed to undertake certain administrative functions for the Trust's insurance plan. The agreement is entitled "Limited Administrator Agreement (Third–Party Administrator)." The agreement provided that the Administrator, Corroon and Black, was responsible for claims processing, receiving premiums, administrative duties, and underwriting. The administrative duties specifically included informing policyholders of termination or lapse in coverage. The agreement did not specifically address COBRA notification. (Plaintiff's Exhibit 38).

10. Neither the policy (Plaintiff's Exhibit 9) nor the Trust Agreement (Plaintiff's Exhibit 8) designates a plan administrator.

11. The plaintiff, Wanda Van Hoove, is the former spouse of Allen Jay Reed. Reed and Van Hoove were married on May 24, 1983. Reed and Van Hoove filed for divorce in Cowley County, Kansas, District Court on April 29, 1988. Van Hoove had signed the divorce petition on April 7, 1988. Neither Van Hoove nor Reed sought a legal separation. The court entered a divorce decree on October 5, 1988. (Defendant's Exhibit H).

12. Before Reed and Van Hoove decided to divorce, they lived in a house located at 618 East 16th Street, Winfield, Kansas. Reed testified that he moved from that house on April 4, 1988. Van Hoove testified that Reed moved from the house sometime before she signed the divorce petition. Therefore, the court finds that Reed was no longer living at 618 East 16th Street, Winfield, Kansas, at the time he terminated his employment with Mid–America. (Testimony of Wanda Van Hoove and Allen Reed).

13. As the spouse of Allen Reed, plaintiff was eligible for health insurance coverage through Mid–America's policy. Plaintiff became eligible at the same time as Reed, November 1987. (Testimony of Allen Reed).

14. In November 1987 Reed and Van Hoove became covered under the Mutual Benefit group coverage. When Mid–America switched from Mutual Benefit to Lincoln National on January 1, 1988, Reed and Van Hoove became covered under the new plan. (Testimony of Wanda Van Hoove and Allen Reed; Plaintiff's Exhibit 24).

15. At the time of coverage under the Lincoln National policy, Reed was issued a Certificate of Insurance by Lincoln National.

The Certificate was included in a booklet entitled "Your Group Insurance Plan." This booklet was published by the Trust. (Plaintiff's Exhibit 24).

16. On the subject of continuation coverage, the booklet states:

An employee whose medical insurance would otherwise end for any reason, except the ending of this policy, may continue his or her medical insurance and his or her dependent's medical insurance, subject to the following terms:

a. This continuation applies to employees who have been insured under this policy for at least three months in a row.

b. The employee will pay the premium for the continued insurance in advance to the Policyholder. The premium will be the rates for his or her insurance classification as an active employee, and if his or her dependents are insured, for his or her dependent's insurance.

c. The continued insurance will end on the earliest of the following dates:

1) the date such insurance would have ended without this Continuation Subsection, if the premiums required in b. above are not paid;

2) the date the employee becomes re-employed and eligible for health care coverage under a group policy or plan sponsored by his or her employer;

3) the date discontinued group insurance is replaced by like group health care coverage;

4) the end of the three month period commencing on the date such insurance would have ended without this Continuation Subsection;

5) for dependents, the date the depended ceases to be eligible for insurance under this policy;

6) the date this policy ends.

(Plaintiff's Exhibit 24, Bates nos. 020039–020040).

17. In December 1987, a meeting was held at Mid–America to explain the new insurance coverage to Mid–America's employees. Wilson, along with Perez, conducted the meeting. The booklets were handed out to employees at that meeting. The branch managers were responsible for delivering the booklets to any employees who were not in attendance. (Testimony of Abel Perez and Bill Ketcham). Reed testified that he did not attend the meeting.

18. Plaintiff acknowledges that Reed received the booklet and that she was in possession of the booklet at all relevant times. (Testimony of Wanda Van Hoove).

19. When Mid–America acquired the Lincoln National insurance, Corroon and Black sent to Mid–America an Administrative Kit and an Employee Claim Kit. (Defendant's Exhibits D & I).

20. The Employee Claim Kit contained a document entitled "Information for Employers Regarding Employee Retirement Income Security Act of 1974 (ERISA)." One section of that document is entitled "Special Notice to Employers Regarding Rights under the Employee Retirement Income Security Act of 1974." The section outlines the duties of the plan administrator and states the following: "ERISA requires plan administrators—people who run plans—to tell you the important facts you need to know in writing and free of charge.... Corroon and Black Benefits, Inc. (CBBI) is currently the administrator of your group insurance program." (Defendant's Exhibit I, Bates no. 050127).

21. The ERISA information page directed the employee to review the Summary Plan Description. The summary plan description identified the Trust as the sponsor of the health insurance plan and Corroon and Black as the plan administrator. (Defendant's Exhibit I, Bates no. 050126).

22. The Employee Claim Kit also included a page entitled "If You Have a Claim." This page stated in relevant part: "To assure prompt claim service, mail the completed form and bill(s) to the plan Administrator: Corroon & Black Benefits, Inc." Corroon and Black's address was then given. (Defendant's Exhibit I, Bates no. 050124).

23. Reed received a copy of the Employee Claim Kit. (Testimony of Allen Reed).

24. The Administrative Kit which Corroon and Black issued to Mid–America when it obtained the Lincoln National policy con-

tained instructions and forms. One of the forms was entitled "COBRA Notification." The COBRA Notification form states that the employer "must notify the Administrator within 30 days of the date" of the termination of a covered employee's employment. The form further states: "You must within 14 days notify the qualified beneficiary of his medical and/or dental continuation rights." According to the directions given, sending a qualified beneficiary an election form constitutes sufficient notice. The "Termination" subsection of the form entitled "Employee Additions/Changes/Terminations" states in relevant part as follows: "When an employee terminates employment, you should cancel his or her coverage by drawing a line through that employee's name on your monthly premium notice, noting the date of employment termination in the space provided." (Defendant's Exhibit D).

25. Charles Efflandt, the attorney who represented Corroon and Black and Lincoln National in this litigation, testified on behalf of plaintiff.[2] Efflandt testified that Mid–America was the plan administrator. Efflandt arrived at that conclusion by looking at the three documents that controlled the insurance plan: the policy (Exhibit 9); the Third Party Administrator Agreement (Exhibit 38); and the Declaration of Trust (Exhibit 8). Efflandt testified that the documents were silent as to who was the plan sponsor or the plan administrator. As discussed below, the relevant statutes provide that if the controlling documents are silent, the employer is deemed to be the plan sponsor and the plan administrator. 29 U.S.C. § 1002(16). Efflandt recognized that Corroon and Black is referred to as administrator in some documents. He testified, however, that Corroon and Black took on only limited administrative duties and was not the "plan administrator."

2. Defendant objected to Efflandt's testimony on the grounds that it would be hearsay and improper opinion testimony. Defendant withdrew its objection later during the trial.

3. Perez did not keep a duplicate of the notice allegedly sent to Reed. However, introduced at trial was a copy of the form which Perez had

26. Although Efflandt is a credible witness and has a number of years of experience with ERISA and COBRA, the court finds that his testimony is entitled to little weight in this case. The court recognizes that Efflandt's testimony represented no more than his position as an advocate for Corroon and Black and Lincoln National. Moreover, his testimony concerned more legal opinions than factual observations. Any facts to which Efflandt did testify are contained in the exhibits produced at trial.

27. The court finds that the documents under which the Lincoln National policy operated, considered in their totality, identify Corroon and Black as the plan administrator. In particular, the court finds that by the Third Party Administrator Agreement (Plaintiff's Exhibit 38), Corroon and Black agreed to act as the plan administrator. However, Corroon and Black, through the Administrative Kit, attempted to delegate part of its COBRA duty to the employers under the plan. Whether this attempt is acceptable is discussed in the Conclusions of Law below.

28. Allen Reed worked under Bill Ketcham, who was the branch manager of the Winfield office. Ketcham is also Van Hoove's stepfather. (Testimony of Allen Reed and Bill Ketcham).

29. Allen J. Reed terminated his employment with Mid–America on April 11, 1988. (Testimony of Allen Reed; Defendant's Exhibit C).

30. Perez testified that on April 15 or April 18, 1988, he sent to Allen J. Reed's last known address, 618 East 16th Street, Winfield, Kansas, a form on which Reed could elect to continue health insurance coverage.[3] The envelope was addressed to Reed only. Along with the form was a note that stated as follows: "Dear Jay, Please respond to the following *ASAP*!! Call me if you have any questions regarding form. Thanks, Abel

filled out with the same information he had filled out on the form allegedly sent to Reed. The note was also a reproduction. Although plaintiff expresses doubts about the accuracy of the reproductions, the court will accept the reproduction as accurate except as discussed in footnote 3 below.

Perez." The portion of the form to be filled out by the employer contained information about Reed and Mid–America. The date of termination was correctly listed as April 11, 1988. The form stated that to continue coverage, the election must be made by June 11, 1988.[4] The monthly premium to be paid if continuation coverage was elected was listed as $38.61. Finally, the form stated that the monthly payment was to be made by May 1, 1988, in order to continue coverage. Perez testified that this meant Reed was to contact the office by May 1, 1988. (Testimony of Abel Perez; Plaintiff's Exhibit 2).

31. The court finds that the note and form described in the preceding paragraph was mailed to Reed's last known address within fourteen days of Reed's termination of employment. (Plaintiff's Exhibits 1 & 2).

32. No other written notification of continuation coverage rights was sent to either Reed or Van Hoove. (Testimony of Allen Reed, Wanda Van Hoove & Abel Perez).

33. The notification allegedly sent to Reed did not instruct Reed to tell plaintiff of her continuation rights. Nor did the notification inform Reed that plaintiff had the right to elect continuation coverage irrespective of whether Reed chose to continue coverage. (Plaintiff's Exhibit 2). In short, Mid–America's only step toward notifying plaintiff of her COBRA rights was its attempt to notify Reed of his continuation rights.

34. There was testimony at trial that Abel Perez attempted to reach Reed by telephone. However, it is undisputed that if any such attempts were made, they were unsuccessful. (Testimony of Wanda Van Hoove & Abel Perez).

35. At the time the form was sent, and at all times relevant to this action, plaintiff resided at 618 East 16th Street, Winfield, Kansas. (Testimony of Wanda Van Hoove).

36. Reed and Van Hoove testified that they did not receive the election form.

37. The election form was not returned to Mid–America. (Testimony of Abel Perez).

38. Reed paid premiums through April 1988. The last premium deduction for Reed's health insurance coverage was on April 14, 1988, in the amount of $38.61. Therefore, the insurance coverage for Reed and plaintiff ended on April 30, 1988. (Defendant's Exhibit C).

39. Plaintiff was suffering back and neck problems and had a series of diagnostic tests in May 1988. Plaintiff underwent surgery on May 24, 1988. Plaintiff's surgery involved removing a disc from her neck and the fusing of two vertebrae. According to the testimony at trial, the surgery was necessary, and if plaintiff had not undergone the procedure, she would have become paralyzed. (Testimony of Wanda Van Hoove).

40. During the month of May 1988, plaintiff incurred medical expenses in the amount of $11,335.73. (Plaintiff's Exhibits 13 through 22).

41. Plaintiff submitted a claim for these expenses to Corroon and Black. In September 1988, plaintiff was informed that the claim was denied because plaintiff's insurance coverage had terminated on April 30, 1988. (Testimony of Wanda Van Hoove).

42. Plaintiff testified that because of the denial of coverage, plaintiff was unable to pay her medical bills. Plaintiff testified that her inability to pay has subjected her to humiliation, she has been denied credit, and Dr. Stein has refused to treat her further. (Testimony of Wanda Van Hoove).

43. Plaintiff contacted Abel Perez on September 21, 1988, regarding the denial of coverage. Abel Perez contacted Ed Wilson about ways to assist plaintiff. Mid–America did not however, offer continuation coverage at that time. Perez advised plaintiff by a letter dated September 29, 1988, to contact the Department of Labor. (Testimony of Abel Perez; Defendant's Exhibit J).

44. At the time of Allen Reed's termination, Abel Perez was, as Mid–America's personnel director, responsible for notifying Corroon and Black of terminations of Mid–America employees.

---

4. On the reproduction introduced at trial, Perez had written "6–11–89." He testified, however, that on the original form he had written "6–11–88."

45. For the first few months that Mid–America was under the Lincoln National policy, Corroon and Black was billing and collecting premiums on a monthly basis. Beginning in May 1988, however, the premium notices from Corroon and Black were issued quarterly rather than monthly. (Testimony of Abel Perez; Defendant's Exhibit D).

46. Because of the change to a quarterly billing notice, Abel Perez did not attempt to notify Corroon and Black of Reed's termination until July 1988. At that time, Perez drew a line through Reed's name on the quarterly premium notice. Perez did not indicate the date of Reed's termination or state that Reed had terminated his employment. (Plaintiff's Exhibit 43).

47. Plaintiff claims she was told by Abel Perez, through Ketcham, that she had insurance coverage through the end of May, 1988. (Testimony of Wanda Van Hoove). Ketcham testified that he had a conversation with Perez in which he asked Perez whether Van Hoove's surgery would be covered. According to Ketcham, Perez told Ketcham that he would check and get back to him. Ketcham testified that Perez later told Ketcham that plaintiff was covered. Ketcham claims the conversation took place in May 1988. The conversation took place at Mid–America's main office in Wichita. (Testimony of Bill Ketcham).

48. Perez testified that he did tell Ketcham that plaintiff was "covered through the end of the month." However, Perez testified that the conversation took place in April 1988. Perez acknowledged that in his conversations with Ketcham, he did not mention that plaintiff had the right to continue her health insurance coverage. (Testimony of Abel Perez).

49. Van Hoove testified that she asked Ketcham to speak to Perez on her behalf after she learned that she would have to have surgery. Plaintiff claims this was in May 1988. (Testimony of Wanda Van Hoove).

50. Allen Reed testified at trial that he had told plaintiff her surgery would not be covered by his insurance policy through Mid–America because coverage would continue for only thirty days after termination. (Testimo-

ny of Allen Reed). Plaintiff denied that Reed told her the surgery would not be covered. According to plaintiff, Reed told her that she should seek verification of coverage before having surgery. (Testimony of Wanda Van Hoove).

51. Plaintiff testified that she did contact the insurance company and obtained pre-approval. (Testimony of Wanda Van Hoove). No record of any such pre-approval was produced at trial.

52. There was some dispute at trial as to whether Mid–America was notified of the informal separation and divorce proceedings between Van Hoove and Reed. Bill Ketcham testified at trial that he believes he mentioned the impending divorce to Abel Perez. Perez testified that he was not informed of any separation. There was no evidence presented that either Reed or Van Hoove notified Mid–America of the informal separation. Nor was there any evidence that Mid–America was given Reed's new address.

53. Perez testified that he did not know about Mid–America's statutory obligation to report terminations to the plan administrator within thirty days. Perez believed that drawing a line through Reed's name on the quarterly premium statement constituted sufficient notice. (Testimony of Abel Perez).

54. The court finds that Abel Perez, in performing his duties regarding the health insurance plan, acted in good faith and in reliance on the instructions given to him by Corroon and Black. Perez was a highly credible witness at trial. It was clear that any deficiencies in his efforts at COBRA notification were due to lack of experience and training and not due to any bad faith. When Perez learned that Van Hoove's claim had been denied, he attempted to remedy the situation. He consulted Ed Wilson and Lisa Bacon and recommended that plaintiff contact the Kansas Insurance Commission and the United States Department of Labor. (Testimony of Abel Perez).

55. As a result of the problems with Van Hoove's insurance coverage rights, Mid–America has changed its policy regarding COBRA notifications. Mid–America now includes a form letter with the election form;

the company separately notifies spouses of employees; and copies of such notices are retained in Mid–America's main office. (Testimony of Abel Perez and Gary Ackerman).

56. Perez testified as to Mid–America's procedure for handling out-going mail. Outgoing mail was first given to Mid–America's receptionist, who ran the mail through a postage machine. Once each day, Fred Barry, a Mid–America warehouseman who was formerly employed by the United States Postal Service, gathered the out-going mail in a bag and delivered it to the post office. (Testimony of Abel Perez).

57. Jorge Gomez is currently Mid–America's Director of Special Services. He held the position of personnel director immediately prior to Perez starting in December 1984. (Testimony of Jorge Gomez). Mid–America's records include continuation notices for most of the employees terminated while Gomez was the personnel director. (Exhibits L, M, and N).

58. The court finds that if Van Hoove had been properly notified of her continuation rights, she would have elected to continue coverage under the health care plan offered by Mid–America. (Testimony of Wanda Van Hoove).

59. There was no evidence at trial the plaintiff or Reed informed Corroon and Black of their divorce.

### CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over plaintiff's COBRA claim pursuant to 29 U.S.C. § 1132(e)(1) and (f).

2. The District of Kansas is the proper venue for this action. 29 U.S.C. § 1132(e)(2).

3. All necessary and indispensable parties are parties to this action.

4. Plaintiff, as a beneficiary under Mid–America's health insurance plan, is entitled to bring this civil action for the relief provided for in 29 U.S.C. § 1132(c) or "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1).

5. COBRA, 29 U.S.C. §§ 1161 et seq., amends ERISA, 29 U.S.C. §§ 1001, et seq., to guarantee that coverage under employer-provided health insurance plans would be allowed to continue in certain circumstances where it would otherwise terminate. 29 U.S.C. § 1161(a) states:

The plan sponsor of each group health plan shall provide, in accordance with this part [29 U.S.C. §§ 1161 et seq.], that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

6. Plaintiff was a qualified beneficiary under Mid–America's group health insurance plan. 29 U.S.C. § 1167(3)(A)(i).

7. As a qualified beneficiary, plaintiff was entitled to continue her health insurance coverage after her husband terminated his employment with Mid–America. 29 U.S.C. § 1161(a). Plaintiff would be required to pay for the continued coverage. 29 U.S.C. § 1161(a).

8. 29 U.S.C. § 1163 provides in relevant part as follows:

For purposes of this part [29 U.S.C. §§ 1161 et seq.], the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part [29 U.S.C. §§ 1161 et seq.], would result in the loss of coverage of a qualified beneficiary:

. . . . .

(2) the termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

(3) the divorce or legal separation of the covered employee from the employee's spouse.

. . . . .

9. Allen J. Reed's termination of employment with Mid–America was a qualifying event which triggered the COBRA notification requirements. 29 U.S.C. § 1163(2).

10. COBRA requires notification of continuation coverage rights both at the commencement of coverage and upon the occurrence of any qualifying event. 29 U.S.C. § 1166(a)(1) and (4). The court will first consider whether proper notification of COBRA rights was provided at the commencement of coverage.

11. COBRA's notice provision for the commencement of coverage states:

In accordance with regulations prescribed by the Secretary—

(1) the group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this [part], ...

29 U.S.C. § 1166(a)(1).

12. Reed and Van Hoove were entitled to notification of their COBRA rights at the time Mid–America acquired the Lincoln National policy. 29 U.S.C. § 1166(a)(1).

13. The continuation coverage notification in the booklet entitled "Your Group Insurance Plan" is insufficient to satisfy § 1166(a)(1) for two reasons. First, it leaves out significant information, including the election period, the date the first premium is due after election, and the termination of coverage for failure to pay the premium. Second, it erroneously states that the continuation coverage terminates no later than "the end of the 3 month period commencing on the date such insurance would have ended without this Continuation Subsection." Under COBRA the plan must provide for continuation coverage to last as long as eighteen months from the qualifying event. 29 U.S.C. § 1162(2)(A)(i).

14. There was no evidence that Reed or Van Hoove received any other written notification of their continuation rights at the commencement of coverage. Therefore, the court concludes that sufficient COBRA notification was not given at the commencement of coverage.

15. The court must next decide whether Mid–America had the duty to provide the commencement notification. Under COBRA, the duty to provide such notice is on "the group health plan." 29 U.S.C. § 1166(a)(1).

16. 29 U.S.C. § 1167(1) defines "group health plan" but does not state who has the duty to act on behalf of the group health plan. The court agrees with the court in *Kidder v. H & B Marine, Inc.,* 734 F.Supp. 724, 730 (E.D.La.1990), *aff'd in part, rev'd in part on other grounds,* 932 F.2d 347 (5th Cir.1991), that in the context of commencement notification, the "group health plan" is all the parties to the plan. As a member of the Trust, Mid–America was a party to the Lincoln National plan. Therefore, the court concludes that Mid–America was responsible, along with the other parties to the plan, for providing Reed and Van Hoove notification of their COBRA rights when Mid–America obtained the Lincoln National policy. Because the notification of continuation rights was insufficient, Mid–America breached its duty under 29 U.S.C. § 1166(a)(1).

17. COBRA's provision for notification upon the occurrence of a qualifying event states in relevant part as follows:

In accordance with regulations prescribed by the Secretary—

. . . . .

(2) the employer of an employee under a plan must notify the administrator of a qualifying event described in paragraph (1) [death of employee], (2) [termination (other than for gross misconduct) or reduction of hours of employee's employment], (4) [employee's eligibility for title XVIII Social Security benefits], or (6) [chapter 11 proceedings of employer of retired employee] of [29 U.S.C. § 1163] within 30 days ... of the qualifying event,

(3) each covered employee or qualified beneficiary is responsible for notifying the administrator of the occurrence of any qualifying event described in paragraph (3) [employee's divorce or legal separation] or (5) [dependent child ceases to be dependent child],

(4) the administrator shall notify—

(A) in the case of a qualifying event described in paragraph (1), (2), (4), or (6) of

[29 U.S.C. § 1163], any qualified beneficiary with respect to such event, and

(B) in the case of a qualifying event described in paragraph (3) or (5) of [29 U.S.C. § 1163] where the covered employee notifies the administrator under paragraph (3), any qualified beneficiary with respect to such an event, of such beneficiary's rights under this [part].

29 U.S.C. § 1166(a).

18. A notification under 29 U.S.C. § 1166(a)(4) must be made by the administrator within fourteen (14) days of when the administrator is notified of the qualifying event. 29 U.S.C. § 1166(c).

19. According to 29 U.S.C. § 1165(1) the election period must be at least sixty days after the beneficiary is notified of COBRA rights pursuant to 29 U.S.C. § 1166(4).

■ 20. The court will next consider whether plaintiff was adequately notified of her COBRA rights when Allen Reed terminated his employment with Mid–America. For the reasons set forth below, the court concludes that she was not adequately notified.

■ 21. The courts are divided on the issue of what constitutes sufficient notification to an employee's spouse upon the employee's termination. *See Mlsna v. Unitel Communications, Inc.*, 825 F.Supp. 862, 865 n. 2 (N.D.Ill.1993) (COBRA requires separate notices to employee and spouse); *Conery v. Bath Assocs.*, 803 F.Supp. 1388, 1399 (N.D.Ind.1992) (Notice to covered employee constitutes sufficient notice to all other qualified beneficiaries with the same last known address); *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 688 (11th Cir.1992) (appropriate to send COBRA notification to husband of qualified beneficiary who was in persistent vegetative state); *Dehner v. Kansas City Southern Indus., Inc.*, 713 F.Supp. 1397, 1399 (D.Kan. 1989) (sufficient notice to spouse where employer included spouse's notification in envelope with employee's notification and instructed employee to give information to spouse). However, the method of notification must represent a good faith effort to comply with a reasonable interpretation of the statute. *Jachim v. KUTV, Inc.*, 783 F.Supp. 1328, 1333

(D.Utah 1992), and must be reasonably calculated to inform the spouse of his or her rights under COBRA. *See Dehner*, 713 F.Supp. at 1400. In this case, Mid–America attempted only to notify Allen Reed of *his* right to continue coverage. The notification sent to Reed did not even mention that plaintiff had the right to continue coverage. It indicated only that Reed had the right to continue coverage for himself and his dependents. The form did not instruct Reed to inform plaintiff of her COBRA rights. The court concludes, therefore, that the notification sent, even if sufficient as to Reed, was not reasonably calculated to inform Van Hoove of her COBRA rights. No other notification was sent to Van Hoove. Therefore, the court finds that Van Hoove did not receive proper COBRA notification upon Reed's termination of employment.

■ 22. The notification form Perez sent to Reed is deficient even as notice to Reed of his continuation rights under COBRA. The form sent to Reed contained erroneous statements about COBRA election. First, the form stated that the election period would end on June 11, 1988. However, as the notice was sent no earlier than April 15, 1988, this did not allow for a sixty-day election period as the statute requires. 29 U.S.C. § 1165(1). Second, the form stated that in order to continue coverage, the monthly premium would be due by May 1, 1988. The statute provides that the beneficiary has forty-five (45) days to make payment after he or she elects to continue coverage. 29 U.S.C. § 1162(3). Even if Perez did intend only that Reed contact the office by May 1, 1988, this is not clear from the form. Moreover, as stated above, this would not allow for the mandatory sixty day election period. Finally, the form stated that the monthly premium would be $38.61. This does not represent the cost of continuation coverage. It represents the amount of Reed's payroll deductions for insurance when he was a Mid–America employee. (Defendant's Exhibit C).

23. There is no dispute that Mid–America is the "employer" within the meaning of COBRA.

■ 24. There is also no dispute that Mid–America failed to notify Corroon and Black of Allen Reed's termination within thirty days of the termination. This constitutes a violation of COBRA. 29 U.S.C. § 1166(a)(2).

25. Defendant argues that it did not know of its obligation to report terminations to the administrator within 30 days. The court understands that Corroon and Black's reporting procedures coupled with the change in billing caused Mid–America confusion. However, Corroon and Black did inform Mid–America that it was obligated under COBRA to notify the Administrator of an employee termination within thirty days of the termination. Moreover, COBRA does not relieve an employer of its obligations when the employer misunderstands its duties.

26. Plaintiff argues that Mid–America also violated the duty to inform her of her continuation rights.

27. The term "administrator" is defined at 29 U.S.C. § 1002(16)(A) as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated; ·

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulations prescribe.

28. The term "plan sponsor" is defined at 29 U.S.C. § 1002(16)(B) as:

(i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

29. 29 U.S.C. § 1132(c) provides that any administrator (A) who fails to meet the requirements of [29 U.S.C. § 1166(1) or (4) ] with respect to a participant or beneficiary, ... may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure ..., and the court may in its discretion order such other relief as it deems proper.

■ 30. Defendant contends that the documents under which the health insurance plan for Mid–America employees is operated establish that Corroon and Black is the plan administrator. Plaintiff argues that those documents are silent as to the identity of the administrator. Therefore, according to plaintiff, the plan sponsor is the administrator. Plaintiff further contends that the plan is a single employer plan, which makes Mid–America the plan sponsor, and also the plan administrator.

31. In this case the terms of the instruments under which the Lincoln National policy operated designated Corroon and Black as the plan administrator. (Findings of Fact ¶ 27). Therefore, Corroon and Black was the plan administrator as a matter of law and was obligated to perform all the plan administrator's duties.

■ 32. Plaintiff argues that even if Mid–America is not the plan administrator under ERISA's definition, Mid–America is the *de facto* administrator because it undertook the administrative duties of COBRA notification. However, the Tenth Circuit has rejected the notion of *de facto* administrators under ERISA. *McKinsey v. Sentry Ins.,* 986 F.2d 401, 404 (10th Cir.1993). Therefore, this argument by plaintiff must fail.

■ 33. Plaintiff further argues that Mid–America is estopped from denying that it is the plan administrator. The court disagrees. Estoppel applies in ERISA cases only under extraordinary circumstances, *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir. 1993), and does not apply in this case. The ordinary elements of estoppel are: (1) a material representation; (2) reliance; and (3) damages. *Id.* In this case, plaintiff has not alleged any representation by Mid–America as to continuation rights, only a failure to

inform plaintiff of her rights. *See id.* at 1010. Therefore, Mid–America is not estopped from denying that it is the plan administrator.

 34. 29 U.S.C. § 1105(c)(1)(A) states that "[t]he instrument under which a plan is maintained may expressly provide for procedures for allocating fiduciary responsibilities among named fiduciaries." COBRA notification is a fiduciary responsibility, *see Willett v. Blue Cross and Blue Shield of Alabama,* 953 F.2d 1335, 1340 (11th Cir. 1992), and both Corroon and Black and Mid–America are fiduciaries with regard to this policy. However, § 1105(c)(1)(A) does not apply in this case because the policy instruments did not expressly provide a procedure for allocation. Corroon and Black merely misrepresented in the Administrative Kit that the duty of notification was on the employer without properly invoking § 1105(c)(1)(A). Therefore, this attempt at delegation was unsuccessful.

35. COBRA provides that the maximum period of continuation coverage must be at least eighteen months in the case of a termination of employment and at least thirty-six months in the case of divorce. 29 U.S.C. § 1162(2)(A)(i) and (ii). However, coverage may terminate earlier if the qualified beneficiary fails to timely pay premiums, 29 U.S.C. § 1162(2)(C), or becomes covered under another group health insurance plan. 29 U.S.C. § 1162(2)(D)(i).

 36. Plaintiff's filing for divorce did not constitute a qualifying event under COBRA in April 1988 because the divorce was not final until October 1988, and no legal separation was sought.

 37. The entry of the divorce decree on October 5, 1988, did constitute a qualifying event. Upon obtaining the divorce, plaintiff became eligible to elect an additional eighteen months of health insurance coverage through Mid–America. 29 U.S.C. § 1162(2)(A)(ii). However, the beneficiary is responsible for notifying the administrator of a divorce or legal separation within sixty days of its occurrence. 29 U.S.C. § 1166(a)(3). The right to notification of continuation rights is generally contingent upon compliance with § 1166(a)(3). 29 U.S.C. § 1166(a)(4)(B). However, plaintiff in this case was not informed of her responsibility under § 1166(a)(3). Therefore, her obligation to inform the administrator of her divorce never arose. *Kidder,* 734 F.Supp. at 731 n. 7.

 38. In this case, plaintiff has incurred medical expenses in the amount of $11335.73, due to the surgery on her neck. The purpose of the civil enforcement provisions of COBRA is, above all, to put plaintiffs in the same position they would have been in but for the violation. *Phillips v. Riverside, Inc.,* 796 F.Supp. 403, 411 (E.D.Ark.1992); *Gaskell v. Harvard Co–Op Soc.,* 762 F.Supp. 1539, 1543 (D.Mass.1991), *vacated on other grounds,* 3 F.3d 495 (1st Cir.1993). It is therefore appropriate to compensate plaintiff for her losses. However, plaintiff's medical bills alone are not the proper measure of damages. The court must reduce the amount by any deductibles or co-payments, as well as the premium that Van Hoove would have had to pay had she elected continuation coverage. *Phillips,* 796 F.Supp. at 411. At trial, the parties presented no evidence either as to what portion of plaintiff's medical expenses Lincoln National would have paid if plaintiff had been covered or as to the premium plaintiff would have paid if she had elected to continue coverage. Therefore, the court grants the parties twenty (20) days to reach an agreement regarding these matters. If no agreement is reached and reported to the court within that time, the court will set an evidentiary hearing to determine the appropriate damage award.

 39. In restoring plaintiff to the position she would have been in but for the COBRA violation, it is appropriate to award plaintiff prejudgment interest. *See Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692 (7th Cir.1991); *McGee v. Equicor–Equitable HCA Corp.,* No. 87–1721–K, 1990 WL 76446 at *1 (D.Kan.1990). Whether to award prejudgment interest, and at what rate, are matters left to the discretion of the court. *Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1030–31 (4th Cir.1993). Although the rate of prejudgment interest allowed on a

federal claim is a matter of federal law, the courts generally look to state law to determine the rate of prejudgment interest. *See id.* at 1031. *But see, Ford v. Alfaro,* 785 F.2d 835, 842 (9th Cir.1986) (strong policy in 9th Circuit for application of 28 U.S.C. § 1961—postjudgment interest rate—to awards of prejudgment interest). The prejudgment interest rate in Kansas is ten percent annually as provided at K.S.A. § 16–201. *Farmers State Bank v. Production Credit Ass'n of St. Cloud,* 243 Kan. 87, 103, 755 P.2d 518 (1988). The court, in its discretion, concludes that this is an equitable rate of interest under the circumstances of this case. The interest rate shall apply from May 25, 1988, forty-four days after Reed terminated his employment with Mid–America.

40. 29 U.S.C. § 1132(g)(1) provides that the court in its discretion may award a reasonable attorney's fee and costs to either party. The Tenth Circuit Court of Appeals has listed the following factors that the court is to consider in determining whether to award attorney's fees in ERISA cases:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to personally satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; .

(4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and

(5) the relative merits of 'the parties' positions.

*Gordon v. United States Steel Corp.,* 724 F.2d 106, 109 (10th Cir.1983). The factors listed are not exclusive. *Id.*

■ 41. In this case, the court concludes that an award of costs and attorney's fees is appropriate. The defendant, Mid–America, is able to pay attorney's fees. The court has found no evidence of bad faith, simply a lack of understanding of COBRA. Although the court recognizes that Mid–America has already taken steps to correct the problems in its notification procedures, an award of attorney's fees would have a further deterrent effect in that it would alert Mid–America to the seriousness of its CO–BRA obligations. This suit was brought for the benefit of plaintiff only, and not on behalf of all beneficiaries. However, the court concludes that the defendant's arguments in this case that plaintiff was properly notified of her COBRA rights and that defendant complied fully with COBRA objectively lack merit.

■ 42. The statutory penalty under § 1132(c) is available only against the plan administrator. As discussed above, Corroon and Black is the plan administrator of the Lincoln National health plan. The court is not in a position to alter or expand the remedial scheme Congress created. Moreover, the § 1132(c) penalty is discretionary, and the court would be disinclined to award a penalty in this case because the court has found that Mid–America acted in good faith in attempting to provide COBRA notification. Therefore, the penalty under § 1132(c) is not available against Mid–America.

■ 43. Finally, Mid–America argues that the $10,000 settlement plaintiff received from Corroon and Black and Lincoln National should offset Mid–America's liability. The court disagrees. Mid–America's liability is based on 29 U.S.C. § 1132(a) and is designed to put plaintiff in the position she would have been but for the statutory violation. Had Corroon and Black, the plan administrator, remained in the case, the court would have had the discretion to penalize Corroon and Black up to $100 per day for its statutory violations. It would be inappropriate to offset plaintiff's damages with a settlement amount that more closely represents a penalty than compensation for damages.

**IT IS BY THIS COURT THEREFORE ORDERED** that judgment be entered for the plaintiff on her claims under COBRA against the defendant Mid–America Building Maintenance, Inc. The parties are hereby granted twenty (20) days in which to reach an agreement regarding the amount of damages. If agreement is not reached within

that time, the court will set an evidentiary hearing to determine the damage amount. In addition to damages, defendant is hereby ordered to pay plaintiff's costs, including attorney's fees. The parties shall comply with D.Kan.Rule 220 regarding the attorney's fees award.