**Eileen D. MLSNA, Plaintiff–Appellee,**

v.

**UNITEL COMMUNICATIONS, INC., Defendant–Appellant.**

No. 95–2645.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1996.

Decided July 29, 1996.

Denice A. Gierach (argued), Naperville, IL for Plaintiff–Appellee.

John J. Curry (argued), Sandra M. Weil, Weil & Associates, P.C., Northbrook, IL, for Defendant–Appellant.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

This case comes to us for the second time. Our first opinion can be found at 41 F.3d 1124 (7th Cir.1994). We assume familiarity with the contents of that opinion and will address only the facts and legal issues that are relevant to the much narrower questions now before us. The fundamental question before the district court, after our reversal of its initial summary judgment award to Eileen Mlsna, was whether Theodore Mlsna ("Mlsna") was terminated for "gross misconduct" under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. §§ 1161–69, thus relieving Unitel Communications, Inc. ("Unitel") of its COBRA duty to provide the Mlsnas with notice of their right to elect continuation medical

insurance coverage through Unitel's group health plan. After a bench trial the district court found that Mlsna was not terminated for gross misconduct and thus that Unitel was liable for violating COBRA. We affirm.

## I.

We noted in our initial opinion that the date and circumstances of Mlsna's departure from Unitel were disputed issues of fact. 41 F.3d at 1128. Mlsna maintains that he tendered his resignation with one week's notice on January 23, 1989 to Paul Mallin and was immediately fired by Mallin. Mallin is the president and sole owner of Unitel. Mallin maintains that although Mlsna gave notice on January 23, he continued working until January 25, when Mallin fired him after learning that Mlsna was starting a competing company and attempting to steal Unitel employees and customers. As noted above, the most important factual dispute remanded to the district court was whether Mlsna was fired for gross misconduct.

After a seven-day bench trial, the district court determined that Mlsna was fired immediately after tendering his resignation on January 23, 1989. The court also found that Mlsna was fired because he gave notice and not for gross misconduct. Thus Mlsna's termination constituted a "qualifying event" for COBRA purposes, 29 U.S.C. § 1163, entitling the Mlsnas to notice of their right to continue medical insurance and subjecting Unitel to substantial liability for its admitted failure to provide this notice.

In large part this case came down to determining which version of events, Theodore Mlsna's or Paul Mallin's, was the more truthful. While the district court was not particularly impressed with the job skills of either, it clearly found Mlsna to be much more credible than Mallin. In a ruling from the bench immediately following trial, the district court made the following statements: 1) "I largely believe Ted Mlsna and I almost entirely disbelieve Paul Mallin, on whose testimony the defense of this suit is largely based ...";  2) "I find that Paul Mallin would say virtually anything that came to his mind that would in his view help his cause and would do so regardless of its truth"; 3) "It is difficult for me to characterize adequately the degree to which I found Mr. Mallin's testimony to be insincere, untruthful and manipulative. It was redeemed only by the fact that he is not a skillful liar, but a liar he is, and it was quite manifest [to] me that this was the case here"; and 4) "[W]hen I first heard the testimony of Mr. Mlsna, I was disconcerted because I thought that Mr. Mlsna was not being entirely truthful, and this is always disturbing to a court, ... but Mr. Mlsna's occasional distortions of truth were dwarfed entirely by the entirely untruthful testimony of Mr. Mallin."

Unitel's claim that Mlsna was fired for gross misconduct centered around two basic themes: 1) evidence of Mlsna's failings in his job at Unitel as controller and 2) testimony that Mlsna plotted to start up a new competing company while still at Unitel and that he lured certain Unitel employees and customers away to this new company. As to the first theory, the district court acknowledged that the evidence submitted by Unitel indicated that the quality of Mlsna's work at Unitel was lacking: "I do not believe [Mlsna] was fully capable of doing his job, particularly with the barter method employed by Unitel, and he was neither energetic enough, nor creative enough to cope with the management of the business as Paul Mallin conceived of it." The district court concluded, however, that Mlsna's inadequacies as an employee did not amount to gross misconduct: "The fact is that proof that Ted Mlsna was not particularly competent does not prove gross misconduct." Regarding Unitel's second theory of gross misconduct, the district court found that Mlsna was not involved in forming a competing company while he was still at Unitel. Although Mlsna admitted that he joined Hans Herrmann (another Unitel employee, who had resigned in the fall of 1988) in heading a new telecommunications company (Corporate Systems of America, Inc.) immediately upon leaving Unitel, the district court found that Mlsna had no involvement in the new company until after he left Unitel. The court found that "at most" Mlsna hoped that he could be a part of Herrmann's intended venture, "but no more than that." The court noted that if Unitel had proved misconduct, it was that of Herr-

mann, not Mlsna. In addition, the court determined that Unitel had failed to prove that the new company stole customers from Unitel and noted that Unitel's "theory of conspiracy between Herrmann and Mlsna is a conspiracy without proof of effect on Unitel."

The district court also found that Mallin "is a man who is easily offended by persons who do things he disagrees with or do not do what he says or leave his employ, and his responses are disproportionate." The court further noted, "[Mallin's] employee relation skills by his own admission are quite bad, and I judge this to be true on his demeanor. I do think that he believes the worst of anyone, and I believe that he is either vengeful or spiteful toward former employees." The court acknowledged "Mallin's general suspicion of all who leave him." And after reviewing the evidence submitted by both sides regarding Mallin's earlier termination of Unitel employee Myra Keith—who Mallin accused of dishonesty, drug use, an improper sexual relationship with another employee, poor job performance, and stealing Unitel customers upon her termination—the district court noted that Mallin admitted during his testimony that he "suspicioned" that Keith was doing drugs based on "his own private facts." The court concluded, "[Mallin's] suspicions to him are as good as facts to everyone else. And I believe that is where the gross misconduct issue starts in this case and ends, with Mr. Mallin's suspicions and not very much proof."

We recognized in our previous opinion that if the district court concluded that Mlsna was not fired for "gross misconduct" under 29 U.S.C. § 1163(2)—and thus that Unitel had a duty to provide the Mlsnas with notice of their right to continue medical insurance coverage—the court would have the power to impose a fine under COBRA and award fees. 41 F.3d at 1130. We also stated, "In exercising that discretion the court should take into consideration the presence or absence of good faith on Unitel's part in putting forth the *gross misconduct defense." Id.* We further noted that the district court should base any award of attorney's fees and costs on a determination of "whether the 'losing party's

position [was] substantially justified and taken in good faith, or was that party simply out to harass its opponent.'" *Id.* (citing *Local 504 v. Roadmaster Corp.,* 954 F.2d 1397, 1405 (7th Cir.1992) (internal citation omitted)). After making its other findings of fact at the post-trial oral ruling, the district court found that the gross misconduct defense was not made in good faith by Unitel. The court explained that this defense was "made only by virtue of lying to the court about what [Mallin] felt and thought and knew at the time of the incident in this case." The court then assessed a COBRA fine of $20 per day, though it had assessed a fine of only $10 per day when it originally entered summary judgment for Eileen Mlsna. The court explained this increase by noting that Unitel's case now appeared "substantially worse" than it had initially, emphasizing particularly his credibility determination that Mallin's testimony was "insincere, untruthful, and manipulative."

In the district court's subsequent written order, it further clarified its factual findings and determined the money damages owed by Unitel to Eileen Mlsna. It found that Theodore Mlsna was not fired for gross misconduct, that a qualifying COBRA event occurred on January 23, 1989 when Mlsna was fired after tendering his resignation, and that the gross misconduct defense raised by Unitel was not made in good faith and was not substantially justified. The court then awarded Eileen Mlsna the following damages: 1) $23,916.45 for her uninsured medical bills, 2) $59,800.90 for attorney's fees under 29 U.S.C. § 1132(g)(1), 3) $1759.98 for costs, and 4) $20 per day under 29 U.S.C. § 1132(c) for the period from March 9, 1989 to May 9, 1995, for a total fine of $45,040. Thus Unitel's total liability amounted to $130,517.33.

## II.

Unitel appeals the district court's finding that Mlsna was not terminated for gross misconduct on a number of fronts. Unitel argues that the determination itself was erroneous, that the district court wrongly failed to determine whether Mlsna's firing was later redesignated as one for gross misconduct, and that Unitel only needed to show a good

faith basis for its gross misconduct determination to avoid COBRA liability. In addition, Unitel maintains that the district court was biased and that it abused its discretion in awarding the enhanced fees under COBRA and attorney's fees.

■ We review the district court's factual determinations, including its factual finding that Mlsna was not fired for gross misconduct, only for clear error. *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.1996); *Maher v. Harris Trust and Savings Bank*, 75 F.3d 1182, 1187 (7th Cir.1996). In addition, we note that district court determinations of credibility are entitled to special deference, since they often depend on a witness's demeanor and appearance on the stand, from which appellate courts are totally removed. *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 673–74 (7th Cir.1993); *United States v. Fidelity and Deposit Co.*, 986 F.2d 1110, 1116 (7th Cir.1993). As the Supreme Court has declared, "only the trial judge can be aware of the variations of demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Unitel acknowledges that the district court found Mallin, its star witness, to be almost totally unbelievable. It argues, however, that it presented substantial objective evidence of Mlsna's gross misconduct—in the form of "independent" witnesses and significant documentary evidence—that the district court improperly failed to consider. Essentially, Unitel maintains that the district court was so overwhelmed by its distaste for Mallin and bias against his company that it ignored the objective evidence of Mlsna's gross misconduct.

We begin our analysis by noting that the district court determined that Mlsna was terminated on January 23, 1989, a factual finding that we have no reason to disturb. This finding in particular essentially came down to a credibility call between Mlsna and Mallin's version of events; and the district court did not clearly err in choosing to believe Mlsna's version. In addition, any claim that Mallin fired Mlsna *on January 23* for gross misconduct does not even accord with Unitel's version of the evidence. In fact, Mallin repeatedly testified that throughout the time that Mlsna was controller at Unitel, he considered Mlsna's job performance to be "excellent." At points in his testimony, Mallin maintained that Mlsna was essentially running the whole show at Unitel and apparently doing a good job of it.[1] Even according to Mallin, it was not until January 24 that he ever doubted Mlsna's ability or loyalty.[2] Thus there was no evidence that could have supported a finding by the district court that Mlsna was fired for gross misconduct on January 23, 1989.

Furthermore, after considering the evidence that Unitel maintains conclusively demonstrates gross misconduct on the part of Mlsna, we simply do not conclude that the district court's rejection of the gross misconduct defense was clearly erroneous. As noted above, Unitel essentially focussed its claim of gross misconduct on Mlsna's job performance at Unitel and his actions in regard to the new company. Unitel's evidentiary submissions regarding Mlsna's work as Unitel's controller involved the following alleged misconduct: 1) failing to keep adequate, up-to-date financial records for Unitel, including providing required records to one of Unitel's lending banks; 2) neglecting to manage and

---

1. Mallin stated, for example, that as secretary of the company,

[Theodore Mlsna] really took charge of everybody, everything. Everybody reported to him, everybody, purchasing, service department. He even became somewhat the sales manager because I had two sales managers and the two sales managers went to him instead of me. And pretty soon—the customer service reported to him and everybody went to him and pretty soon nobody talked to me. I was just a figurehead.

2. Mallin testified that on January 24 he received a call from a friend of Shawn Diggory, saying that Diggory had said that Mlsna and Hans Herrmann were starting a new company and that they had said that Unitel was going bankrupt and Diggory should come work for them. Mallin testified that he then called Richard Corso, who said that he also had heard from Mlsna and Herrmann that they were forming a new company to compete with Unitel and that Unitel was going bankrupt.

collect company receivables; 3) submitting unwarranted claims for commissions and advances for other Unitel employees; 4) filing an unfavorable financial statement with Dun & Bradstreet; 5) signing an unfavorable and unauthorized consent to a sales tax audit by the Illinois Department of Revenue; and 6) other similar misdeeds and delinquencies, resulting in substantial unnecessary costs and losses to Unitel.

Unitel acknowledges that all this evidence of delinquent job performance was accumulated only after Mlsna left Unitel.[3] In fact, most of this evidence was "discovered" only after Unitel hired accountant Herb Muskal during the summer of 1989. Muskal testified that although he was initially retained to get Unitel's books up to date, the focus of his work was soon after switched to trying to find things that Mlsna might have done wrong during his time at Unitel—by then Mallin was already convinced that Mlsna (along with Herrmann) was a traitor who had begun undermining Unitel even as an employee. There are at least two major problems with Unitel's claim that its objective evidence conclusively demonstrates that the district court erred in determining that Mlsna did not commit gross misconduct. First, most of the evidence submitted, even if construed as Unitel proposes, would go only to negligence or incompetence on Mlsna's part, not gross misconduct. As the district court noted, job incompetence alone does not constitute gross misconduct for COBRA purposes. While some of the evidence submitted—such as the claim that Mlsna submitted improper commission requests, particularly the one for Hans Herrmann—could arguably be viewed by a trier of fact as evidence of bad faith malfeasance amounting to gross misconduct, the district court's decision not to interpret the evidence in this light is not clearly erroneous. Second, much of Unitel's evidence of Mlsna's on-the-job errors was

inconclusive regarding whether Mlsna had done anything improper or blameworthy, let alone committed gross misconduct.

For example, Unitel maintains that Mlsna assented to the results of a sales tax audit done by the Illinois Department of Revenue that led to a $400,000 settlement by Unitel for delinquent sales taxes,[4] though Unitel's debt should allegedly only have been in the $150,000 range. The district court found Unitel's evidence in this regard confusing and inadequate. In particular, the district court noted that Muskal, Unitel's accountant, was unable to explain the method by which he calculated the sales tax debt to be $150,000 or the rationale by which the Department of Revenue came to their $400,000 figure. Mallin now claims that, at the very least, Mlsna should not have consented to the audit results without consulting with Unitel's accounting firm at the time. Mallin admitted, however, that Mlsna never claimed to have talked to the accountants when he advised Mallin of the results of the audit and that he (Mallin) was the one who actually signed the settlement agreement and wrote the initial check for $100,000. Mallin also acknowledged at trial that, as the sole owner of Unitel who had filed all the faulty tax returns, he could have gone to jail if this issue had not been settled. And while Mallin claims he was furious with Mlsna about his handling of the sales tax audit, Mallin never gave Mlsna an unfavorable performance review and actually awarded him a $5000 raise during the following year (raising Mlsna's annual salary from $25,000 to $30,000). Thus it is unclear whether Mlsna's actions were even improper.

Similarly, regarding the allegation that Mlsna submitted improper requests for commissions and loans for other employees, along with "authorizing" various other improper company expenditures, in each case it was Mallin who actually authorized the

---

**3.** This admission seems to disallow any consideration of this evidence in determining the circumstances under which Mlsna departed Unitel in late January 1989. The evidence could arguably be relevant, however, to determining whether Unitel had reason to subsequently redesignate Mlsna's termination as being for gross misconduct.

**4.** The sales tax delinquency apparently grew from Unitel's practice of "renting" phone systems at a specified rate for a specified period of time, after which the customer would have the option of purchasing the system for $1. Not surprisingly, the Illinois Department of Revenue found that these arrangements were actually sales, upon which state sales tax was due.

disbursement and wrote the check. Mallin clearly testified that he was the only one at Unitel with check-writing authority (with the limited exception of payroll checks during periods when Mallin was out of town), meaning that all company disbursements ultimately had to go through him. If Mlsna's requests were as obviously illegitimate as Unitel now alleges—and they do not appear so to us—it is hard to understand why Mallin failed to reject any of them or find any fault with Mlsna's performance whatsoever. Furthermore, Unitel utterly failed to substantiate its claim that Mlsna had released an unfavorable financial statement to Dun & Bradstreet. Although Mallin testified that Mlsna had done so, Unitel never produced the alleged financial statement or any objective evidence that such a statement had been given to Dun & Bradstreet. While Unitel's "objective" testimonial and documentary evidence did a moderately good job of showing Mlsna's inadequacy as a controller—a fact that the district court acknowledged—we certainly cannot conclude that the district court clearly erred in declining to find that the evidence showed gross misconduct.

Returning to the issue of the new telecommunications company started by Mlsna and Herrmann, Unitel argues that the evidence it put on regarding Mlsna's stealing of Unitel customers and employees demonstrates that Mlsna engaged in gross misconduct. While the district court heard conflicting evidence regarding Mlsna's possible involvement with this new venture before leaving Unitel, the court determined that Mlsna had nothing to do with the new company until after he left Unitel.[5] In addition, the court specifically stated that it believed Mlsna's testimony that he took no Unitel papers or customer lists with him when he left. Thomas Seiloff, a former Unitel employee who later joined Mlsna and Herrmann's new company, testified that he was never solicited to join the new company, that he contacted Corporate Systems of America on his own when he left Unitel, and that he never heard anything about such a venture while Herrmann and Mlsna were at Unitel. In addition, the evidence that certain Unitel customers later became Corporate Systems of America customers did not establish any impropriety on the part of Mlsna. Thus the district court's findings that Mlsna was not plotting to open a competing company while at Unitel and that he did not steal customers or clients were not clearly erroneous.

Our prior opinion recognized the possibility that Unitel could argue on remand that after Mlsna left the company, Unitel redesignated his departure as a firing for gross misconduct. 41 F.3d at 1128 n. 2. While we did not determine the precise legal consequences under COBRA of such a redesignation, we noted that "it would be strange for an employee to have the power to preempt his employer's decision to terminate him for gross misconduct [by quitting first]." *Id.*

5. The district court specifically considered the testimony of two of the witnesses who said that they had heard Ted talking about the new company *before* leaving Unitel and concluded as follows:

I believe also that Geralyn Hart is at best mistaken about who said what, and I believe that Corso is similarly mistaken.... What I think happened with both Hart and Corso is that they had recollections of conversations with Herrmann that established Herrmann's desire to go out and compete with Unitel, and I believe they simply took Mlsna's subsequent associations with Herrmann and retrospectively attributed conversations they had with Herrmann, at least in part, to Mlsna.

In fact, Corso did not actually testify that Mlsna told him that he and Herrmann were going to start a competing company, but rather that Mlsna suggested that since Unitel was going bankrupt, he was planning to start his own company in the future. The district court specifically noted that the destruction of Corso's contemporaneous notes undermined his testimony. Similarly, Shawn Diggory testified that Herrmann recruited him for his new company in December of 1988, but he did not claim that *Mlsna* recruited him. While the district court did not specifically mention the testimony of Pamela Hettler, the ex-wife of Hans Herrmann, who testified that Mlsna and Herrmann were planning the new company during 1988, it is reasonable to assume that the court heavily discounted her testimony based on her bitterness to her ex-husband and the fact that she only went to Mallin with this allegation after she separated from Herrmann. The district court may also have found her testimony unconvincing because she remembered few specifics regarding how she learned of this new business. We will not upset the district court's factual finding simply because it failed to note why it disregarded the testimony of this witness.

Initially, we point out that while Unitel's entire case at trial focussed on trying to establish that Mlsna had *committed* gross misconduct, it submitted no evidence that it initially or subsequently formally *designated* Mlsna's termination as one for gross misconduct. Unitel did not produce any letter to Mlsna containing any such conclusion or even an internal company document recording such a finding—either initially or via a redesignation. In addition, our earlier review of Unitel's submitted evidence of gross misconduct demonstrates that a redesignation of Mlsna's termination as being for gross misconduct would not have been justified.

Unitel's argument that it only needed a good faith basis for its determination that Mlsna committed gross misconduct meriting termination is interesting and does have a certain resonance with both traditional and modern concepts of employment law, particularly discriminatory discharge law, but we need not decide the issue here. The district court made clear in its ruling that it found that the gross misconduct defense to COBRA liability was not raised in good faith by Unitel. The court essentially found that the gross misconduct argument was manufactured and pieced together by Mallin, with the help of Muskal and others, well after Mlsna's departure and primarily in order to avoid COBRA liability for the company of which Mallin was the sole owner and president. This factual conclusion by the district court was not clearly erroneous and undermines any claim by Unitel regarding its right as employer to terminate an employee about whom it has a good faith belief of gross misconduct, without giving the required insurance continuation notice under COBRA.

## III.

◼ Unitel argues that the district court was biased against it, as evidenced by its "inflamed rhetoric" regarding Mallin's character and credibility, its "skewed interpretation" of the evidence of gross misconduct, and certain rulings made regarding the trial. Unitel does not put much effort into this argument, which is appropriate given the lack of evidence to support it. Usually we address claims of bias in the context of motions to recuse, *see, e.g., Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.,* 991 F.2d 1249, 1255 (7th Cir.1993), but Unitel never made such a motion; and there was no basis to do so. The district court's statements regarding Mallin's credibility are noteworthy in terms of the strength of the court's negative assessment of Mallin, but this alone can hardly constitute bias. As we have noted in similar situations, "judges must often comment on credibility, and we cannot, of course, presume a lack of impartiality merely because an assessment is unfavorable." *Gonzalez v. INS,* 77 F.3d 1015, 1023 (7th Cir. 1996). After reviewing the record, we do not conclude that the district court's findings on Mallin's credibility were indicative of bias, particularly since we reject Unitel's claim that the court's denial of the gross misconduct defense was incompatible with the "objective evidence" of gross misconduct submitted by Unitel. The other rulings and actions challenged by Unitel were reasonable and do not raise the specter of bias.

◼ We review the district court's imposition of the $20 per day COBRA fine for an abuse of discretion. *Cf. Powers v. Chicago Transit Authority,* 890 F.2d 1355, 1362–63 (7th Cir.1989); *Cheek v. Doe,* 828 F.2d 395, 397 (7th Cir.1987). While the total fine is certainly a hefty one, the COBRA statute actually authorizes fines up to $100 per day. 29 U.S.C. § 1132(c). We do not believe that the increase of the fine from $10 to $20 per day was an abuse of discretion in light of the more complete understanding of the case that the court surely had after the actual bench trial, as compared to the summary judgment stage when the initial fine was calculated. Finally, regarding the court's imposition of attorney's fees, we specifically noted in our original opinion that if the court found on remand that the "losing party's position [was] not substantially justified and taken in good faith," it could award costs and attorney's fees. 41 F.3d at 1130; *see also Little v. Cox's Supermarkets,* 71 F.3d 637, 644 (7th Cir.1995); *Hooper v. Demco, Inc.,* 37 F.3d 287, 294 (7th Cir.1994). Although Unitel challenges the awarding of attorney's fees, it does not challenge the amount of the

fees awarded. Once again, because the district court did not commit clear error in finding that Unitel did not raise the gross misconduct defense in good faith, the award of attorney's fees and costs was not an abuse of the court's discretion. *Little,* 71 F.3d at 644 (standard of review for award of fees under 29 U.S.C. § 1132(g)(1) is abuse of discretion); *Hooper,* 37 F.3d at 293 (same). In this case the court's finding that the defense was made in bad faith—essentially that it was concocted to avoid COBRA liability—is equivalent to a finding that the defense was not substantially justified.

For the foregoing reasons, we AFFIRM the decision of the district court.