**Heather LLOYND, Plaintiff,**

v.

**HANOVER FOODS CORPORATION, a Pennsylvania Corporation, Defendant.**

**No. Civ.A. 98–63 GMS.**

United States District Court, D. Delaware.

Nov. 17, 1999.

William W. Pepper Sr., Schmittinger and Rodriguez, P.A., Dover, DE, for plaintiff.

Jeremy W. Homer, Parkowski, Noble & Guerke, Dover, DE, for defendant.

### MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

Plaintiff Heather Lloynd ("Lloynd") initiated this action against her former employer, defendant Hanover Foods Corporation ("Hanover"), alleging that Hanover wrongfully refused to offer her continued health care coverage upon her discharge from Hanover on May 16, 1997. Lloynd alleges that such refusal was in violation of certain provisions of the Consolidated Om-

nibus Budget Reconciliation Act ("CO-BRA"), 29 U.S.C. § 1161 *et seq.*, that amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.* She seeks to recover medical costs she incurred [1] that would have been reimbursed under Hanover's employee health plan had she not been denied her rights under COBRA, statutory penalties under 29 U.S.C. § 1132(c)(1), and attorneys' fees under 29 U.S.C. § 1132(g).

The parties agree that Hanover refused Lloynd access to continued employee health plan coverage upon her termination. They also agree that this case turns on whether or not Lloynd was terminated for "gross misconduct," in which case she would not be entitled to COBRA benefits. *See* 29 U.S.C. § 1163(2). Hanover asserts that Lloynd was terminated for acts amounting to conduct that was intentional, willful or, at the very least, grossly negligent. According to Hanover, such conduct justifies its denial of Lloynd's rights under COBRA. Lloynd contends that because her conduct amounted to no more than ordinary negligence, she was entitled to COBRA benefits.

A one day bench trial was held on November 2, 1999. This Memorandum Opinion sets forth the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

### A. Background

Lloynd was employed by Hanover at its manufacturing plant in Clayton, Delaware from May 1993 until her termination on May 16, 1997. During her employment, Lloynd was covered under Hanover's employee health benefit plan ("the Plan"). The parties have stipulated that the Plan is a "group health plan" within the meaning of 29 U.S.C. § 1167(1) and that Hanover is the plan sponsor and

plan administrator. The parties also agree that Hanover did not offer COBRA benefits to Lloynd upon her termination, nor was she notified of any right to CO-BRA benefits pursuant to 29 U.S.C. § 1166.

Hanover manufactures a variety of food products at its Clayton plant. Lloynd was employed there as an ingredients mixer. As such, her responsibilities included the mixing of ingredients for Hanover's various products. Hanover's employees were apparently assigned to different product lines from day to day.

### B. The Incident Leading to Lloynd's Termination

Lloynd was terminated for an incident occurring on May 8, 1997. On that date she was assigned to mix ingredients for Hanover's ravioli product. There is no dispute that Lloynd failed to add onion powder, a required ingredient, to the eleven batches of ravioli she mixed that day. The dispute centers on whether this omission along with Lloynd's failure to report it are facts from which the inference should be drawn that her failure was intentional.

### 1. The Ravioli Mixing Process—As Designed

Hanover's ravioli ingredients are added in two areas—a "wet ingredients" area and a "dry ingredients" area. The ravioli ingredients are delivered in bulk to the appropriate wet or dry area prior to the start of each shift. Onion powder is to be added in the wet ingredients area.

There are three documents used in the ravioli mixing process. An "ingredient sheet" lists all of the ingredients to be used in the ravioli. A "wet batch card" and a "dry batch card" are located in the appropriate wet or dry area, and each is to list only those ingredients to be added at the respective wet or dry stage.

---

**1.** Lloynd testified that she had scheduled one or more medical procedures which were to be performed the Monday following her termination.

At the start of a shift, the ingredients mixer weighs each of the ravioli ingredients and records the weight of each on the ingredient sheet. The ingredients mixer then makes a batch of ravioli by following the "recipes" listed on the respective wet and dry batch cards. As each batch is completed, the mixer makes a notation on the ingredient sheet and then begins a new batch. At the end of the shift, the mixer is to weigh all unused ingredients and record these remaining weights on the ingredient sheet. The sheet is then turned in to a supervisor for inventory control purposes.

Hanover typically used two individuals to mix the ravioli ingredients—a wet ingredients mixer and a dry ingredients mixer. For some period of time during 1997, however, Hanover used just one ingredients mixer to perform both tasks. On May 8, 1997, Lloynd was the single ingredients mixer assigned to the ravioli line.

### 2. Lloynd's Version of the Events of May 8, 1997

Lloynd testified that May 8, 1997 was the first day that she had ever been responsible for mixing both the wet and dry ravioli ingredients. She had previously mixed the wet ingredients during the time that ravioli mixing was a two person job, but had done so on only a few occasions. Lloynd testified that on May 8, 1997, onion powder was not included on the wet batch card, and that the dry batch card was missing from the place that it should have been. She acknowledged that onion pow-

der was listed on the ingredient sheet and that onion powder was present at the wet ingredients work area. Indeed, Lloynd weighed the onion powder at the start of her shift, and entered the total weight on the ingredient sheet. The May 8, 1997 ingredient sheet, signed by Lloynd, was introduced into evidence. (Def.Tr.Ex.1).[2]

Nevertheless, Lloynd did not add onion powder when mixing the wet ingredients, because she claims that it was not listed on the wet batch card. Nor did she add onion powder when mixing the dry ingredients. She testified that the dry batch card was missing. In lieu of the card, she claims she relied upon a nearby employee, identified only as "Eli," to tell her what ingredients should be added at the dry ingredients area.[3] Because "Eli" did not mention onion powder, Lloynd did not add that ingredient. Lloynd completed eleven batches of ravioli during her shift, marking off each completed batch on the ingredient sheet. At the end of her shift Lloynd recorded the weight of the remaining unused ingredients on the ingredient sheet. She did not, however, record the weight of the unused onion powder. Instead, she left that space blank. Lloynd testified that she assumed that onion powder had been erroneously listed on the ingredient sheet. She also assumed that the powder present at the wet ingredient area had been left there in error. She testified that she understood these types of errors had occurred in the past.

**2.** The parties introduced into evidence a booklet consisting of joint trial exhibits, Plaintiff's trial exhibits, and Defendant's trial exhibits, which will be designated herein as "Jt.Tr.Ex.," "Pl.Tr.Ex.," and "Def.Tr.Ex.," respectively. The parties also introduced into evidence excerpts from various depositions, which will be identified herein by the name of the deponent.

**3.** Until the day of trial, the identity of "Eli" was something of a mystery. At trial, counsel for Hanover reported that there may have been an employee named "Elizar" working in this area on May 8, 1997. When the court asked counsel for Plaintiff why "Eli" had not

been produced at trial, counsel responded that Hanover had been unable to identify this employee prior to trial. Counsel now believed that this person may have been deported sometime after May 8, 1997. Lloynd's testimony regarding "Eli" was at least partially corroborated by one of Hanover's witnesses, Sarah Albarran. She was the "lead person" on the ravioli line on May 8th and Lloynd's immediate supervisor. Albarran testified that she did see Lloynd talking to a man in the dry ingredients area. Based on this corroborating testimony, the court concludes that someone named "Eli" was present and that Lloynd did confer with him on May 8th.

Lloynd then turned in the ingredient sheet to Albarran. Nothing was said about onion powder until Albarran asked Lloynd why there was no entry on the ingredient sheet for the weight of the remaining onion powder. Lloynd told her that she had not used onion powder because it was not listed on the wet batch card. Consequently, she stated that she did not record the weight of the remaining onion powder on the ingredient sheet because she had not used any onion powder. When Albarran told Lloynd that onion powder should have been added, Lloynd became upset and asked Albarran what she should do. Lloynd testified that Albarran *suggested* that Lloynd should tell Pilar Sanchez, Albarran's supervisor, what had happened. According to Lloynd, Albarran said, "If it were me, I would go to Pilar and tell him about this." Lloynd did not understand this to be an "order" to report the incident. She testified that she was too overwrought to speak with Sanchez and did not do so that evening. She was so upset that when she got home she became sick and couldn't sleep. Indeed, Lloynd called in sick the next day, Friday, May 9, 1997.

### 3. Hanover's Version of the May 8th Incident

Hanover claims that Lloynd intentionally omitted the onion powder from the ravioli, knowing that it should have been added. Noting the difficulty of proving such intent through direct evidence, Hanover asserts that circumstantial evidence compels this conclusion. Hanover points to evidence purporting to show (1) that Lloynd's version of the events is implausible, and (2) that Lloynd had a motive to sabotage the ravioli.

As to the implausibility of Lloynd's version, Sarah Albarran testified that in her eight years with Hanover, she had never known of an ingredient sheet including ingredients that were not intended to be added to a product. She also testified that onion powder was always added in the wet

ingredients area and was therefore always listed on the wet batch card. Albarran concedes, however, that she never did check the batch card in the wet ingredients area on May 8, 1997. Hanover introduced into evidence a wet batch card and a dry batch card (Def.Tr.Exs. 5 and 2, respectively), but no witness testified that these were the actual cards present in the wet and dry ingredients areas on May 8th. Further, onion powder is listed on *both* the wet and dry batch cards introduced into evidence. Both Albarran and Sanchez testified that onion powder should not have been listed on the dry batch card. Neither could offer any explanation whatsoever as to why it was listed on that card.

As to Lloynd's motive for sabotage, Hanover asserts that she was retaliating for being forced to work with an employee she did not like, Roylene Marvel. There is little dispute that for some time prior to May 8, 1997, Lloynd and Marvel did not get along well. Indeed, on October 27, 1995, Sanchez issued a written warning to both of them regarding a disagreement between the two. (Def.Ex.8). Albarran and Sanchez both testified that on the evening of May 7, 1997, after the work assignments for May 8th had been posted, Lloynd expressed her displeasure at having been assigned to work near Marvel. William Gaugler, Hanover's vice president of human resources, testified that company officials concluded that Lloynd's failure to add onion powder to the ravioli was an intentional act committed in retaliation for her May 8th work assignment.

### 4. The Omission of Onion Powder was Accidental

Faced with these two widely divergent views as to Lloynd's state of mind, the court finds that her version is the more accurate of the two. The court reaches this conclusion largely on the basis of the credibility of the witnesses. Further, as discussed more fully below, the court finds that Hanover did not, in fact, have a good

faith belief in its assertion of intentional misconduct.

First, the court accepts Lloynd's unrebutted testimony that before May 8th, she had never before worked both the wet and dry ravioli ingredients areas. Her only experience with this product was mixing the wet ravioli ingredients on a few previous unspecified occasions. The court also believes that Lloynd could not find the dry batch card. Instead she relied on "Eli" who told her that onion powder was not to be added at the wet stage. Although Lloynd apparently had the opportunity to confer with Albarran, who was nearby at the time, Lloynd credibly testified that she felt pressure to get the process started and that she believed that "Eli" was familiar with the ravioli ingredients.

Further, the inability of the defendant's witnesses to explain why the dry batch card that Hanover itself introduced into evidence erroneously included onion powder increases the likelihood that, as Lloynd testified, the wet batch card she followed did not include onion powder. Although Albarran testified that the wet batch card always included onion powder, she conceded that she never checked the wet batch card in the wet ingredients area on May 8, 1997. Additionally, Hanover's change in the approach to ravioli ingredients mixing—i.e., from a two person job to a one person job—likely contributed to Lloynd's confusion (and perhaps "Eli's" confusion as well) on May 8th. In sum, there was sufficient evidence of confusion regarding the proper ravioli ingredients for the court to believe Lloynd's testimony that she did not intentionally withhold onion powder as an act of sabotage.

Perhaps more important than this evidence of confusion, the court rejects as, at best, farfetched and, at worst, a contrivance, the position advanced by Hanover that Lloynd was so angry with her assignment that she risked losing her job by committing an act of sabotage. The court does believe that Lloynd and Marvel did not get along and that Lloynd expressed her displeasure with Marvel to Albarran and Sanchez on May 7th. Still, the court credits Lloynd's testimony that her displeasure with her co-worker would not have caused her to act in the manner charged by Hanover.[4] The court believes that Lloynd valued her job and her health benefits too much to jeopardize them in this fashion, particularly knowing of her upcoming medical expenses. Further, one might generally expect a saboteur intend their nefarious act go undiscovered so as to have the greatest destructive effect. Yet, Lloynd made no effort to cover up her tracks. She recorded the beginning weight of the onion powder on the ingredient sheet, and having used no powder during her shift, simply left the ending weight blank for all to see.

In addition, Albarran's testimony regarding her discussion with Lloynd at the end of the shift also supports a finding that Lloynd did not act intentionally. Albarran testified that when she informed Lloynd that onion powder should have been added, Lloynd reacted with surprise, saying "Oh my God, what do you think Pilar is going to do?" While such comment might also be a natural reaction of an employee "caught in the act," the court understood Albarran's testimony to be that Lloynd was legitimately surprised to learn of the problem. Indeed, in a memorandum dated May 10, 1997, Albarran referred to the incident as a "mistake," and made no mention of intentional misconduct. (Def.Tr.Ex.9).

Finally, as discussed below, Hanover's own documentation of the circumstances surrounding Lloynd's termination completely undermines its assertion that her actions were anything but accidental.

---

**4.** The written warning issued to Lloynd and Marvel in October of 1995, more than a year and a half prior to the May 1997 incident, adds little weight to Hanover's theory of the case.

**5. Lloynd's Failure to Report the Problem to Albarran Does not Suggest Willful or Intentional Misconduct**

In addition to asserting that Lloynd's failure to add the onion powder was intentional, counsel for Hanover argued at trial that since Lloynd must have been aware of the problem when she completed the ingredient sheet at the end of her shift, her failure to report the problem to Albarran constitutes willful misconduct.

As already discussed, however, Lloynd testified that she believed the ingredient sheet to be in error. Consequently, even at the end of her shift, she would not have been aware of a problem with the ravioli. While Lloynd probably should have told Albarran that she believed the ingredient sheet erroneously listed onion powder as an ingredient, the court finds that her failure to do so was not willful. Lloynd made no effort to "cover up" the problem, but rather handed the ingredient sheet to Albarran at the end of her shift and reacted with surprise when Albarran pointed out the problem. Further, as discussed below, Hanover's documentation of the incident does not mention any willful failure to report it to Albarran.

**6. Lloynd's Failure to Report the Incident to Sanchez was Not an Act of Insubordination**

Finally, Hanover asserts that Lloynd was insubordinate when she failed to follow Albarran's instructions to report the incident to Sanchez. Albarran testified that after discussing the problem with Lloynd at the end of the shift, she instructed Lloynd to report the incident to Sanchez and that it was important that she do so. As noted above, however, Lloynd viewed Albarran's comments not as an "order," but rather as a suggestion in response to Lloynd's question as to what she might do to help save her job. She paraphrased Albarran's response as: "If it were me, I would go to Pilar and tell him about this."

The court finds Lloynd's testimony credible, and supported by the following excerpt from Albarran's May 10, 1997 memorandum:

> Her [Lloynd's] next response was what I thought would be done to her. I expressed the importance of going to Pilar [Sanchez] and admitting what she had done. I was under the impression this was what she was going to do until I spoke with Pilar 45 minutes later and he knew nothing about the mistake. I proceeded to explain to him what had happened which is what Heather should have done.

(Def.Tr.Ex.9). The court finds this language to be consistent with Lloynd's version of the events. That is, she made a mistake by not adding onion powder to the ravioli. She was concerned that she might be disciplined for this mistake,[5] and asked for Albarran's advice. Albarran suggested that she thought Lloynd might be disciplined less severely if she admitted the mistake to Pilar herself,[6] but Lloynd was too upset to do so. The court does not view Lloynd's failure to follow Albarran's suggestion as insubordination, nor is insubordination mentioned in Hanover's doc-

---

**5.** Lloynd's fear of discipline for a mere mistake may have stemmed from a written warning she received on May 30, 1996 regarding her alleged failure to notice a dead mouse in flour she was using. The warning stated that Lloynd was expected to pay closer attention to her work, and that "if this occur [sic] again you will be dismiss [sic]. Mistakes like this can not be tolerated." (Def.Tr.Ex.7) There was no suggestion at trial that Hanover viewed this earlier incident as intentional, nor as being any part of the "gross misconduct" for which Lloynd was purportedly terminated in May 1997.

**6.** The Court is convinced that Albarran's advice was not offered out of quality control concerns, since by this point Albarran herself knew that onion powder had not been added to the ravioli. Ultimately, the ravioli passed a blind taste test by the customer, which then accepted the product.

umentation of the incident, as discussed below.

### C. The Termination Process and Hanover's Documentation Thereof

#### 1. The Termination Process

When Lloynd reported back to work on Monday, May 12th, she was told to report to the plant personnel manager, Tony Romano. Romano told Lloynd to go home and return the next day. When she returned on Tuesday, May 13th, she met with Romano, Sanchez, and William Pennington, a union steward at the plant. After discussing the incident, Lloynd was told to return for another meeting on Friday, May 16th. At that meeting, Romano informed Lloynd that she had been terminated and that her medical benefits were canceled. Concerned over upcoming medical expenses she was expecting to incur, Lloynd then asked Romano about the availability of COBRA. He told her to wait while he called Hanover. Several hours later, Romano informed Lloynd that she would not be offered COBRA benefits.

While there was no documentation of the discussions at these meetings, there was no testimony or other evidence that Lloynd was told that she was being terminated for intentional misconduct. In fact, Donald Taylor, the plant superintendent and a witness for Hanover, testified at his deposition that the company's decision—a decision made by himself and Pilar Sanchez—was that Lloynd was being terminated for "gross negligence." (Taylor Dep. at 22–23).

#### 2. Hanover's Documentation of the Reasons for Termination

Several documents were prepared relating to the May 8th incident. None of

these documents suggest intentional or willful misconduct, failure to report the onion powder problem to Albarran, or insubordination of any type. First, as noted above, Albarran's May 10 memorandum referred to the incident as a "mistake." Next, Hanover completed a Delaware Health and Social Services form on June 2, 1997 that described the reason for Lloynd's termination as "gross negligence," without further comment. (Jt.Tr.Ex.1).

Next, the Delaware Department of Labor (DOL) issued a report on June 3, 1997 concluding that Lloynd was eligible for unemployment compensation because Hanover failed to show that there was willful or wanton misconduct on Lloynd's part. (Pl.Tr.Ex.3). Although the court attaches no weight to the DOL's conclusion,[7] the DOL's "findings of fact" stated in the report describe both Lloynd's and Hanover's versions of the incident as provided to the DOL in telephone interviews. The DOL's characterization of Hanover's version suggests ordinary negligence: "The employer states that the claimant had to inventory the ingredients to be used before she started mixing the ravioli and that when she didn't use one of the ingredients listed, it *should have been* a red flag to her." (*Id.*) (emphasis added). The Hanover personnel clerk who spoke with the DOL on Hanover's behalf, Mary Arendt, testified at her deposition that this statement accurately reflects Hanover's version of the event that she conveyed to the DOL after reviewing the company's files and documents regarding the termination.[8] It is, therefore, fair to conclude that these files

---

7. Counsel for Lloynd asserts that Hanover should be collaterally estopped from arguing that Lloynd's conduct was "willful or wanton" by virtue of the DOL's conclusion. Because the court independently concludes that her conduct was not "willful or wanton," the court need not address this issue.

8. (Arendt Dep. at 7–10). Although Arendt had no personal knowledge of the incident, it

was her job to provide Hanover's account of the events to the DOL. She testified that she did so in this case after reviewing "[a]ll material in the files, documents." (*Id.* at 9). When asked if there was any information that she provided to the DOL that was omitted from the DOL's report, Arendt testified that the only missing information was the amount of product that had incorrectly been mixed.

and documents did not mention intentional misconduct, willful failure to report an error, or insubordination of any kind.

Finally, on a Hanover "personnel action authorization" form prepared in early July 1997, "gross misconduct" is circled as the reason for termination. There is no option on the form, however, for ordinary or gross negligence. In a section for "remarks," a comment states: "Destruction of Company Property (Food Product). Not eligible for COBRA." (Jt.Tr.Ex.32). Although "destruction" could imply intentional conduct, another document produced at trial suggests that this term is used by Hanover to include unintended damage.[9] Despite the fact that this form was prepared after an attorney for Lloynd made two written requests for COBRA benefits (Pl.Exs. 1 and 3), the form still fails to directly state that the incident involved intentional destruction of property, willful failure to report the incident, or insubordination. Further, both the "gross misconduct" characterization and the "remark" just noted were provided by Tony Romano (Arendt Dep. at 12), who, as discussed below, had previously attempted to coerce Lloynd into "resigning" in exchange for COBRA benefits.

D. Hanover's Belated Assertion of its Retaliation Theory, and its Improper Use of COBRA as a Negotiating Tool

Despite the complete absence of assertions of intentional or willful misconduct in Hanover's contemporaneous documentation, William Gaugler, Hanover's vice president of human resources, continued to insist at trial that one of the reasons Lloynd was denied COBRA benefits was that she was terminated for intentional misconduct. The court finds Gaugler's testimony to be completely undermined by the documentation and testimony dis-

cussed above. Further discrediting this testimony is the deposition testimony of Hanover's plant superintendent. Donald Taylor testified that Hanover's decision to terminate Lloynd—a decision that was apparently made at least in part by Taylor— was based on her "gross negligence." (Taylor Dep. at 22–23). The court is convinced that evidence of the occurrence of a disagreement between Lloynd and Roylene Marvel, two years earlier, as well as their apparent continued distaste for one another, is dredged up by Hanover in a post hoc attempt to rationalize a precipitous and ill-considered decision to withhold Lloynd's COBRA benefits. In other words, the court concludes that Hanover was uncomfortable with the soundness of its legal position and developed its retaliation theory at some point after this litigation was initiated.

Finally, the court notes that it is deeply disturbed by what appears to have been Hanover's improper use of COBRA as a negotiating tool. According to deposition testimony introduced into evidence by Hanover, it attempted to coerce Lloynd to recharacterize her termination as a "resignation" in exchange for which Hanover would agree to extend COBRA benefits. Kelley Mitchell, Hanover's manager of employee insurance and benefits, testified that Romano, the plant's personnel manager, informed her that he had attempted to convince Lloynd to "resign" in exchange for COBRA benefits. (Mitchell Dep. at 13). William Pennington, the union steward, testified that he was present when Romano said to Lloynd: "I want you to sign this piece of paper, and then I will give you COBRA if you resign." (Pennington Dep. at 20). This exchange apparently took place after Romano had already informed Lloynd that she had been terminated. (Mitchell Dep. at 13). Lloynd re-

---

9. On April 24, 1995, Lloynd was given a written warning after she attempted to clean a machine with a pair of scissors while the machine was running. (Def.Tr.Ex.4). Although there is no suggestion in the warning

that Lloynd intended any damage, the warning states "this could have been a serious accident, it cost downtime and destroy [sic] company property." (*Id.*).

fused Romano's offer to "resign." The court is troubled by this negotiating tactic. Although parties are to be encouraged to settle their disputes through private agreement, the court is confident that Congress did not enact COBRA for the purpose of providing employers with another negotiating lever.

### E. Damages

The parties have stipulated that the value of the COBRA benefits withheld from Lloynd is $3,000.99. This figure represents medical expenses she incurred that would have been reimbursed by the Plan had she been given the opportunity to elect continuation coverage under COBRA, less premiums that she would have had to pay under the Plan.

### III. CONCLUSIONS OF LAW

COBRA requires sponsors of group health plans to provide employees with the option of electing continuation coverage after the occurrence of a "qualifying event." 29 U.S.C. § 1161. One such "qualifying event," and the one at issue in this case, is the termination of employment for a reason other than an employee's "gross misconduct." 29 U.S.C. § 1163(2). The continuation coverage must be offered for a period of at least eighteen months after the date of a qualifying termination. 29 U.S.C. § 1162(2)(A)(I). The plan may generally pass on the cost of continuation coverage to the employee. 29 U.S.C. § 1162(3). The employer is required to notify the plan administrator of a qualifying termination within thirty days of the date of such termination. 29 U.S.C. § 1166(a)(2). The plan administrator then has an additional fourteen days to notify the employee of his or her right to elect continuation coverage. 29 U.S.C. §§ 1166(a)(4), (c). ERISA provides employees with a private cause of action against plan administrators failing to provide the required notifications under CO-BRA. 29 U.S.C. § 1132(a)(1).

### A. Lloynd Was Entitled to Continuation Coverage under COBRA

As previously noted, the parties agree that this case turns on whether or not Lloynd was properly terminated for acts amounting to "gross misconduct." If she was, Lloynd would not be entitled to CO-BRA benefits. *See* 29 U.S.C. § 1163(2). The term "gross misconduct" is not statutorily defined, and case law interpreting this term is somewhat sparse. Courts analyzing the term's meaning have concluded, however, that some sort of intentional or willful misconduct is generally required. Ordinary negligence or incompetence alone will not suffice. *See, e.g., Mlsna v. Unitel Communications, Inc.,* 91 F.3d 876, 881 (7th Cir.1996) ("[M]ost of the evidence submitted ... would go only to negligence or incompetence on [plaintiff's] part, not gross misconduct.... [J]ob incompetence alone does not constitute gross misconduct for COBRA purposes."); *Zickafoose v. UB Serv., Inc.,* 23 F.Supp.2d 652, 655–56 (S.D.W.Va.1998) (noting that "gross misconduct" can include conduct intended to harm the employer or conduct that is "outrageous, extreme, or unconscionable"); *Collins v. Aggreko, Inc.,* 884 F.Supp. 450, 454 (D.Utah 1995) ("Gross misconduct may be intentional, wanton, willful, deliberate, reckless or in deliberate indifference to an employer's interest. It is misconduct beyond mere minor breaches of employee standards, but conduct that would be considered gross in nature."); *Paris v. F. Korbel & Bros., Inc.,* 751 F.Supp. 834, 838 (N.D.Cal.1990) (suggesting that "gross misconduct" requires an "evil design" to injure an employer, and that "poor judgment" is insufficient to meet this standard).

Hanover contends that Lloynd was terminated for conduct that was intentional, willful, or at the very least grossly negligent. The court disagrees. The court has already rejected Hanover's assertion that Lloynd's conduct was intentional or willful. The court has also found that Hanover does not have a good faith belief in this

assertion. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680 (7th Cir. 1997) (concluding that an employer's good faith belief that an employee was guilty of gross misconduct is not sufficient to avoid COBRA liability unless the employee did in fact engage in gross misconduct).[10]

Although the case law cited above does not make clear whether "gross negligence" constitutes "gross misconduct" for COBRA purposes, the court need not make that determination today. Rather, the court concludes only that Lloynd's failure to add onion powder to the ravioli on May 8, 1997 and her failure to recognize the problem and bring it to the attention of Sarah Albarran constitute at most ordinary negligence. These acts and omissions do not rise to the level of "gross misconduct" for COBRA purposes. The court need not characterize Lloynd's failure to obey Albarran's "order" to report the problem to Sanchez because the court has already found that no such "order" was given. Indeed, even if Albarran intended her comments to be a directive, the court concludes that Lloynd's failure to recognize it as such does not constitute "gross misconduct."

■ Because Lloynd was terminated for a reason other than "gross misconduct," she was entitled to elect continued health care coverage under COBRA. Accordingly, Hanover's failure to notify Lloynd of that right was a violation of 29 U.S.C. § 1166(a)(4) for which she may recover under 29 U.S.C. § 1132(a)(1).

## B. Remedy

Lloynd seeks to recover medical costs she incurred that would have been reimbursed under Hanover's employee health plan had she not been denied her rights under COBRA, statutory penalties under 29 U.S.C. § 1132(c)(1), and attorneys' fees under 29 U.S.C. § 1132(g). The court concludes that each of these remedies is warranted on the facts of this case.

The civil enforcement provision of ERISA provides in pertinent part that an administrator that fails to provide the notification required by 29 U.S.C. § 1166(a)(4) "may in the court's discretion be personally liable to [a plan participant] in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1). The court also has discretion to award a prevailing party reasonable attorneys' fees. 29 U.S.C. § 1132(g).

### 1. Reimbursement of Net Medical Expenses Incurred

■ As previously noted, the parties have stipulated that Lloynd has incurred $3,000.99 in net unreimbursed medical expenses. One purpose of ERISA's civil enforcement provision is to put the plaintiff in the same position as she would have been absent a violation. *See Van Hoove v. Mid–America Bldg. Maintenance, Inc.*, 841 F.Supp. 1523, 1536 (D.Kan.1993) (citations omitted). Accordingly, Lloynd's net unreimbursed medical expenses of $3,000.99 are a proper element of recoverable damages under § 1132(c)(1), and will be included in the judgment awarded her. *See id.; Phillips v. Riverside, Inc.*, 796 F.Supp. 403, 411 (E.D.Ark.1992).

### 2. Statutory Penalties

■ The purpose of ERISA's penalty provision is to induce compliance with statutory notification requirements and to

---

**10.** In *Rotto v. Haskells of Pittsburgh*, 1997 WL 689437 (W.D.Pa.1997), the district court concluded that the relevant inquiry is whether the employer had a good faith belief that the employee engaged in intentional misbehavior, not whether the employee actually engaged in such behavior. *Id.* at *6. As support for this proposition the court cited the district court opinion that was later reversed by the Seventh Circuit Court of Appeals in *Kariotis. Id.* The court need not determine whether an employer's good faith, but mistaken, belief that an employee has engaged in "gross misconduct" will relieve it of COBRA liability, because the court concludes that Hanover did not have such a good faith belief.

punish non-compliance. *See DiSabatino v. DiSabatino Bros., Inc.*, 894 F.Supp. 810, 816 (D.Del.1995); *Phillips*, 796 F.Supp. at 411. Both the decision to award penalties and the amount of any award are within the discretion of the trial court. *See* 29 U.S.C. § 1132(c)(1); *Boyadjian v. CIGNA Companies*, 973 F.Supp. 500, 505–07 (D.N.J.1997). Factors to consider in deciding whether to assess a penalty include bad faith or intentional misconduct on the part of the administrator, the number of requests for compliance made, and the existence of prejudice to the plan participant. *See Boyadjian*, 973 F.Supp. at 505.

■ Statutory penalties are appropriate in this case in light of several factors discussed in the court's findings of fact. Lloynd requested COBRA benefits at least three times—once on the day she was terminated and twice via letters from her attorney in the month following her termination. Hanover's position at trial—that Lloynd was terminated for intentional misconduct and/or insubordination—is contradicted by its own contemporaneous documentation of the incident. Hanover's failure to notify Lloynd of her rights to continuation coverage resulted in her inability to elect such coverage and forced her to institute this litigation to recover medical expenses that should have been paid by the Plan. Finally, Hanover's improper use of COBRA as a negotiating tool warrants imposition of statutory penalties.

Statutory penalties can be assessed beginning on the date of the COBRA violation. 29 U.S.C. § 1132(c)(1). Since Lloynd was terminated on May 16, 1997, Hanover was required to notify Lloynd of her right to elect COBRA benefits within forty-four days thereafter—i.e., by June

29, 1997. *See* 29 U.S.C. § 1166(a)(4), (c); *DiSabatino*, 894 F.Supp. at 817. In *DiSabatino*, the court held that a penalty for failure to notify a plan participant of her right to elect continuation coverage should not extend beyond the end of the continuation coverage period required to be offered. *DiSabatino*, 894 F.Supp. at 817. In this case, Hanover was required to offer continuation coverage for eighteen months after the May 16th termination date—i.e., until November 16, 1998. The court will therefore assess penalties for the 505 day period from June 29, 1997 to November 16, 1998.[11]

Plaintiff proposes that a penalty of $50 per day is appropriate, for a total penalty of $25,250. Courts have imposed a wide range of penalties under the statute, and as one court has recently noted, there is little precedent to guide the court's discretion. *See Boyadjian*, 973 F.Supp. at 506–07 (collecting cases). In light of the factors that warrant the assessment of penalties in this case, as discussed above, the court finds that a penalty of $25,250 is reasonable and appropriate.

### 3. Attorneys' Fees

■ In deciding whether to exercise its discretion to award reasonable attorneys' fees under 29 U.S.C. § 1132(g)(1), the court must consider at least the following five factors:

1. the offending party's culpability or bad faith;

2. the ability of the offending party to satisfy an award of attorneys' fees;

3. the deterrent effect of an award of attorneys' fees against the offending party;

---

**11.** Some courts have apparently permitted statutory penalties to extend beyond the end of the eighteen month continuation coverage period. *See, e.g., Mlsna v. Unitel Communications, Inc.*, 91 F.3d 876, 879, 883 (7th Cir. 1996) (affirming a district court's assessment of a penalty of $20 per day for over six years, apparently ending on the date of the court's

order); *Phillips v. Riverside, Inc.*, 796 F.Supp. 403, 411–12 (E.D.Ark.1992) (assessing penalty of $5 per day for 642 days, ending on the date the complaint was filed). As Lloynd's proposed conclusions of law follow the approach taken in *DiSabatino*, and since the court finds that approach to be reasonable, the court will assess the statutory penalty on that basis.

4. the benefit conferred on members of the [Plan] as a whole; and

5. the relative merits of the parties' position.

*McPherson v. Employees' Pension Plan of American Re–Insurance Co.,* 33 F.3d 253, 254 (3d Cir.1994).

The court finds that the first factor favors Lloynd, given its findings that Hanover did not have a good faith belief in its intentional misconduct theory, that Hanover's documentation of the reasons for Lloynd's termination is, at best, marginal and that Hanover improperly sought to coerce Lloynd into recharacterizing her termination as a resignation. *See McPherson,* 33 . F.3d at 256–57 (noting that this factor includes not only bad faith pursuit of a litigation position, but also other culpable or blameworthy conduct).

Although the court suspects that Hanover can afford to pay Lloynd's attorneys' fees, no evidence was introduced regarding Hanover's financial status, so the court gives no weight to the second *McPherson* factor.

The third *McPherson* factor favors Lloynd, since the court finds that awarding attorneys' fees will not only be likely to deter the conduct referred to in the court's discussion of the first factor, but will also encourage Hanover to more carefully investigate and document its decisions regarding terminated employees' rights to COBRA benefits.

The fourth factor does not favor an award because the COBRA violation established in this case provides no immediate benefits to other Plan participants. Although other Hanover employees may benefit in the future from Lloynd's assertion of her rights in this case, such benefit is already properly considered in the third *McPherson* factor. *See DiSabatino,* 894 F.Supp. at 818 (citing *Hamilton v. Bank of New York,* C.A. No. 94–436, 1995 WL 447659, at *6 (D.Del.1995)).

Finally, the fifth factor also favors an award of attorneys' fees in this case. Had Hanover attempted to more vigorously defend the position reflected in its own documentation of the incident—i.e., that Lloynd was terminated for gross negligence and that such conduct constitutes "gross misconduct" for COBRA purposes—this factor might not favor an award of attorneys' fees in light of the absence of clear guidance on the definition of "gross misconduct." Instead, however, Hanover chose to hang its hat on its intentional misconduct theory, asserting "gross negligence" as an afterthought at best.

■ After weighing these factors, the court finds that an award of reasonable attorneys' fees is appropriate in this case, and directs counsel for Lloynd to file an affidavit detailing such fees.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that Hanover's failure to notify Lloynd of her rights to elect continued health care coverage under COBRA was in violation of 29 U.S.C. § 1166(a)(4). As a result Lloynd is entitled to recover damages in the amount of $28,250.99, representing net unreimbursed medical costs incurred in the amount of $3,000.99 plus statutory penalties in the amount $25,250. Lloynd is also entitled to recover her reasonable attorneys' fees in an amount to be determined after her submission of an affidavit detailing such fees. An Order consistent with this opinion shall issue.

### *ORDER*

For the reasons stated in the Court's Memorandum Opinion of this date, IT IS HEREBY ORDERED that:

1. Judgment is entered in favor of Plaintiff and against Defendant in the amount of $28,250.99, representing net unreimbursed medical costs incurred by Plaintiff in the amount of $3,000.99 plus statutory penalties in the amount $25,250; and

2. Plaintiff is entitled to her reasonable attorneys' fees pursuant to § 1132(g)(1). Plaintiff shall submit, within fifteen (15) days of the date of this Order, a petition for counsel fees together with an affidavit detailing the number of hours devoted to this action and the hourly rate requested. Such petition shall also provide evidence supporting the reasonableness of the requested fees. Defendant shall have fifteen (15) days from the date of this submission to file objections, if any, to Plaintiff's petition.